<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Binal Vaidya through Rashmin Vaidya as Guardian ad Litem and Rashmin Vaidya, individually, and Sudha Vaidya, individually<br><br>Plaintiffs,<br><br>v.<br><br>Township of Edison, a Municipal Corporation of the State of New Jersey, Township of Edison Police Department, et al.<br><br>Defendants. | Civil Action No. 11-3212 (SDW)<br><br><br><br>**OPINION**<br><br><br><br>September 9, 2013 |

**WIGENTON**, District Judge.

Before this Court are defendants, the Township of Edison, the Township of Edison Police Department ("Police Department") (collectively "Municipal Defendants"), Patrolman Shawn T. Meade ("Officer Meade" or "Defendant Meade"), Hemlata Nayee, Pravin Nayee, Jitendra Nayee, and Pooja Nayee ("Nayee Defendants") (collectively with the Municipal Defendants and Defendant Meade referred to herein as the "Defendants") separate motions for summary judgment pursuant to Federal Rules of Civil Procedure 56 ("Motions") to dismiss the complaint of plaintiffs Binal Vaidya (through Rashmin Vaidya as Guardian ad Litem), Rashmin Vaidya and Sudha Vaidya (collectively "Plaintiffs").

This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 1343(a), and 1367(a); 42 U.S.C. §§ 1983, 1985, 1986, and 1988; and 18 U.S.C. §§ 1961-1968. Venue is

proper in this District pursuant to 28 U.S.C. § 1391(b). These Motions are decided without oral argument pursuant to Fed. R. Civ. P. 78.

For the reasons discussed below, this Court **GRANTS IN PART AND DENIES IN PART** the summary judgment motion of Defendants.

**BACKGROUND AND PROCEDURAL HISTORY**

*a. Parties and Background*

Plaintiff Binal Vaidya was born on August 28, 1994 and lives in Edison, New Jersey. (Municipal Defendant's Ex. ("Ex.") A[1], Binal Vaidya Dep. Tr. 7:20-22, T8:4-5.) Binal Vaidya is a minor and resides with her father, Rashmin Vaidya, and mother Sudha Vaidya. (Compl. ¶ 4.)

The Nayee Defendants' family members are the Vaidyas' distant relatives. (Ex. B, Rashmin Vaidya Dep. Tr. 6:20-25.) The two families reside approximately four blocks away from each other in Edison, New Jersey, but no longer socialize with each other. (*See generally* Ex. B, Tr. 7:9-11, 13:17-15:3; Ex. A, Tr. 17:21-24.) The relatives regularly socialized and Jitendra Nayee worked at Rashmin Vaidya's liquor store in Lyndhurst, New Jersey for approximately three years after having loaned Rashmin Vaidya $25,000 to purchase the store. (Ex. B, Tr. 7:25-8:10, 9:19-25, 51:3-24.) In 2008, Jitendra stopped working at the liquor store and opened up his own grocery store after the Vaidya home was burglarized. (Ex. B, Tr. 9:23-11:25, 12:7-19.) Following the burglary incident, Jitendra Nayee became upset because he felt that Rashmin Vaidya implied that he was involved in the burglary. (Ex. B, Tr. 13:4-8.) Since then, the families no longer socialize. (*See* Ex. B, Tr. 13:17-15:3.)

On July 8, 2009, defendant Pooja Nayee received two unsigned notes at her home.[2] (Ex. E.) The first note read, "I will you kill you Pooja. I did the black magic on you. Except I won't tell my

---

[1] The exhibits referenced herein, unless otherwise specified, refer to the exhibits submitted with the Municipal Defendants' motion for summary judgment. (Dkt. No. 42.)

name and you know that you did that with coconut and lemon. It will not work. Hint: Lady Named with S. [ ] NEVER!!" (Ex. E 1 (emphasis in original).) The second note read,

> "To: Pooja From: Binal (your cousin) . . . (Be Careful) I will kill you Pooja (Pooja my mom wrote this and then she went in the kitchen so I'm writing you this.) The person Who Will Kill You Is Sudha Vaidhya [sic]. I heard my mom say that. She knows black magic and . . . my mom came near your house where you stand at the bus stop near pole. She did black magic. Did you get an envelope before? My brother Kishan sent it from his friend."

(Ex. E 3.)

The same day, around 9:00 p.m., Officer Meade was sent to the Nayee residence on a call for service "for an uncontrollable and crying child." (Ex. D, Officer Meade Dep. Tr. 23:20-24:21; Ex. H, CAD Incident Report #9041728.) When Officer Meade arrived, he was informed that black magic had been done to a young girl and the girl (he estimated approximately 10-12 years of age) was now "possessed." (*See* Ex. D, Tr. 25:7-24; Pls. Statement of Material Facts 2.) Pooja Nayee was the young girl, and her mother, Hemlata Nayee, informed Officer Meade of the notes on her front porch and that her cousin lived at 55 Alcoa Avenue. (Ex. D, Tr. 28:23-29:6.) Pooja Nayee or possibly Hemlata Nayee indicated that her cousin put black magic on her.[3] (*Id.*) Officer Meade was at the Nayee home for approximately fifteen to twenty minutes. (Ex. D, Tr. 30:10-11.)

After leaving the Nayee home, Officer Meade headed to the Vaidya residence where allegedly non-parties, Officer Sudnick and Officer Chang, ultimately met him.[4] (Ex. D, Tr. 32:17-22.) According to Plaintiffs, the officers demanded entry to the home and Plaintiffs did not recognize they had a right to refuse entry. (*See* Compl. ¶ 18.) When Officer Meade entered, Binal Vaidya was "just hanging out" and Kishan, Binal's brother, was "upstairs." (Ex. A, Tr. 33:19-21, 34:9-15.) Binal Vaidya originally thought the officers had come to return the stolen goods from the

---

[2] Plaintiff denies that the two notes were "received," and argues instead that defendant's testimony indicates the notes were "found." (*See* Pl. Responsive Statement of Material Facts 4.)
[3] Hemlata Nayee denies using the phrase "black magic." (Pl. Statement of Material Facts 4-5.)
[4] Plaintiffs' assert there were four officers and not three. (Compl. ¶ 11.)

previous burglary. (Ex. A, Tr. 34:16-25.) Officer Meade explained that he was there on a call for service based on a complaint of black magic.[5] (*See* Compl. 4; Ex. D, Tr. 34:10-24.) Officer Meade asked Binal Vaidya if she had written a note to Pooja Nayee. (*See* Compl. ¶¶ 13-16.) Binal Vaidya said that she had not. (*See* Compl. ¶ 18.) Binal claims she was shaking and the officers "were nodding [and] [s]mirking at each other" after they asked her. (*See* Compl. ¶¶ 17-18; Ex. A, Tr. 38:17-39:2.) Kishan also denied writing the letter. (*See* Compl. ¶¶ 17-18.)

Next, Binal Vaidya claims Officer Meade and her mother talked, while she was taken aside to talk with another officer. (*See* Compl. ¶ 18.) To the contrary, Sudha Vaidya says she did not speak with any officer alone. (Ex. C, Sudha Vaidya Dep. Tr. 17:1-3.) However, Sudha did say she consented to Binal speaking outside with an officer.[6] (*See* Compl. ¶ 22, Ex. C, Tr. 17:4-18.) Binal claims that the officers told her it was bad to lie and because she was a minor she would not get in trouble, but her parents would be taken to jail. (*See* Compl. ¶ 19.) Binal was outside for approximately five to seven minutes with the officers. (Ex. A, Tr. 40: 18-21; Ex. C, Tr. 17:16-18). The front door was not closed. (Ex. C, Tr. 18:9-11.) Binal says she did not feel free to leave when she was outside because she thought she would look guilty if she tried to. (*See* Compl. ¶¶ 18-19; Pls.' Opp'n, Ex. A, Binal Vaidya Dep. Tr. 123:3-11.) Sudha Vaidya claims that she "couldn't hear everything, but [the] only thing [she could] hear was that 'you are lying, you are lying, and you will go to jail.'" (Ex. C, Tr. 18:12-16.) Binal Vaidya said the officers did not do anything to make her feel she could not leave, and she never asked to leave. (Pls.' Opp'n, Ex. A, Tr. 123:15-21.) Likewise, Sudha Vaidya acknowledges she never asked the officers to go outside or if Binal could come back inside. (Ex. C, Tr. 18:19-24.) Additionally, Officer Meade asserts that he did not

---

[5] A call for service is different than an investigation of a crime. (*See* Ex. D, Tr. 34:19-24.)
[6] Plaintiffs' assert that Sudha did not "consent," only telling the officers it was okay to take Binal outside because they "we're innocent, so we didn't know exactly what to do." (Pl. Statement of Material Facts 6.; Compl. ¶¶ 16-22; Ex. C, Tr. 12:4-11.)

4

interview or interrogate Binal Vaidya, but simply had a discussion with her.  (*See* Ex. D, Tr. 66:16-68:12.)

After the conversation with Binal concluded, the officers told Sudha Vaidya that they were going to return to the Nayee home and requested the Vaidyas come with them. (*See* Comp. ¶¶ 24-28.)  Binal Vaidya claims that after the officers left, Sudha called Binal's father, Rashmin Vaidya. (Ex. A, Tr. 48:24-49:5.)  To the contrary, Rashmin Vaidya testified that his wife called him while the police were still at his home. (Ex. B, Tr. 18:7-12.)  Similarly, Sudha Vaidya testified that she asked the officers for permission to call her husband. (Ex. C, Tr. 19:17-19.)  Furthermore, Sudha Vaidya says she asked one of the officers to "speak with her husband to explain what was going on, which he [(the officer)] did." (Ex. C, Tr. 19:20-20:21.)  It is unknown which officer talked to Rashmin Vaidya, but the officer suggested the Vaidyas go to the Nayee home to discuss the situation. (Ex. C, Tr. 19:20-20:21.)  Rashmin Vaidya closed the store after he got off of the phone and approximately twenty minutes later arrived home before going to the Nayee home with Ashok, Kishan, Pooja, Sudha, and Binal Vaidya. (Ex. B, Tr. 22:2-4; Ex. A, Tr. 49:6-8, 49:16-21.)

Binal claims that once they arrived at the Nayee home, everyone started arguing. (Ex. A, Tr. 49:22-23.)  Officer Meade claims that he was asked to play "referee" in the matter but that he denied the request because this was a "civil matter." (Ex. D, Tr. 50:21-51:9.)  However, Rashmin Vaidya testified that Officer Meade did try to get the families to be quiet and was "being helpful" to the Nayee family. (Ex. B, Tr. 29:15-18, 32:15-20.)  Rashmin Vaidya alleges that he asked the Nayee family "why [did] you not call us [(the Vaidyas)]?" (Ex. B, Tr. 25:20-25.)  Plaintiffs also claim that after the police left, relatives of the Nayee family who were at the house, told the Plaintiffs that three Nayee family members wrote the letters. (*See* Compl. ¶ 30.)

5

While Binal Vaidya originally testified to having no interactions with officers at the Nayee home, she later testified that an officer asked her if she was lying again, to which she responded, "no." (Ex. A, Tr. 52:1-6, 18-24.)  Binal Vaidya counted four times throughout the night that she was asked if she was lying. (Pls.' Opp'n, Ex. A, Tr. 117:12-18.)  To the contrary, Rashmin Vaidya testified that Officer Meade continuously asked Binal "how many times [she had] lied to her parents . . . in [her] life?" (Ex. B, Tr. 32:15-33:2.)  The officers stayed at the Nayee home for approximately one hour. (Ex. A, Tr. 54:2-8.)  Binal Vaidya admitted that at no point did an officer touch her, tell her she was under arrest, place her in a police vehicle, tell her she was going to police headquarters, or tell her she would be charged with anything. (Ex. A, Tr. 55:4-6, 7-9, 12-14, 15-17, 23-25.)  Binal and Rashmin Vaidya both admitted that at no time did anyone make any comments regarding their ethnicity.[7] (Ex. A, Tr. 56:1-3; Ex. B, Tr. 36:8-12.)  While Binal said that the officers spoke to both families the same way, Binal and Rashmin Vaidya both testified that Officer Meade treated everyone like they were dumb or an idiot. (Ex. B, Tr. 36:12-15; Ex. A, Tr. 56:11-20.)

Binal Vaidya asserts that Officer Meade was in the wrong when he accused her of lying, when he kept asking her if she was lying, when he raised his voice, and when he left the Nayee home to figure out who wrote the notes. (Ex. A, Tr. 57:3-13, 18-22.)  Binal says that Officer Meade should have told the Nayee family that she did not write the notes. (Ex. A, Tr. 57:18-22.)  Binal says she was never told she was no longer the target of an "accusation" and investigation." (*See* Comp. ¶ 31.)

Following the incident, Rashmin Vaidya says that a Nayee family member approached him and asked him to forget about the situation, to which he responded, "I can't forget it . . . You insulting us and we can't forget it.  We are innocent." (Ex. B, Tr. 35:21-36:6.)  Rashmin Vaidya testified that he felt the Nayee and Vaidya families should have sorted this issue out amongst

---

[7] Binal Vaidya did testify later that she "somewhat" felt treated differently because she was Indian. (Ex. A, Tr. 56:4-7.)

themselves, and that he filed the law suit because the Nayees took "the police in the wrong direction and [the] police help[ed] them to do that." (Ex. B, Tr. 36:22-37:2, 79:14-16.)  Furthermore, Rashmin Vaidya testified that the officers should not have come to his home without first finding out who wrote the letters and claims there has been permanent damage done to the reputation of his family. (*See* Ex. B, Tr. 37:3-13;  Compl. ¶ 32.)

Officer Meade did not create an incident report based on these events; as he asserts, it was a response to a call for service, not a criminal investigation.[8] (Ex. D, Tr. 76:25-77:4.)  Plaintiffs did not file an Internal Affairs complaint in connection with the incident. (Ex. I, Internal Affairs Investigation (#12-019-0301) 2.)  The Police Department, pursuant to its policy, did conduct an Internal Affairs investigation including multiple attempts to speak with the Vaidyas and their attorney, but the requests were refused. (*Id.* 3, 6.)  After interviewing the officers involved and the relevant documents, Detective Sergeant Errico determined that the "[o]fficers actions were justified, legal, and proper, in an attempt to render assistance in a family dispute" and subsequently closed the matter due to the Vaidyas' alleged lack of cooperation.  (*Id.* 6.)

After the incident, Plaintiffs allege that Binal Vaidya developed an obsessive compulsive disorder, paranoia about gang members being outside of her home, inability to speak certain words, and experienced a "freak[ ] out" while watching television programs during "Shark Week." (Ex. A, Tr. 59:16-61:23.)  Plaintiff Binal Vaidya subsequently began seeing a psychotherapist, who prescribed her medicine that reduced the compulsions, but failed to eliminate them completely. (Pls.' Opp'n, Ex. A, Tr. 70:18-71:13.)  Moreover, she began feeling depressed and received in-

---

[8] Officer Chang testified that a note containing the statement, "I will kill you," is a violation of the New Jersey Criminal Statutes N.J.S.A., Section 2C and a terroristic threat.  (Ex. C, Tr. 12:16-13:13.)  Additionally, the Police Department Investigation Report, signed by an Officer Felcetto, labeled this incident as harassment (2C:33-4). (Pls.' Opp'n, Ex. E, "Edison Police Department Evidence Form" 8.)   Officer Meade, while denying this was a criminal matter, did acknowledge that a note containing a threat to kill someone should be classified as a terroristic threat.  (Ex. D, Tr. 76:21-24.)

7

patient treatment at UMDNJ in December of 2010. (Ex. A, Pls.' Opp'n, Tr. 70:18-71:13, 71:22-72:15.)  Binal Vaidya was later evaluated by Pritesh Shah, M.D. ("Dr. Shah"), who found Binal to be suffering from "a [m]ajor [d]epression with [p]sychotic [f]eatures, [o]bsessive [c]ompulsive [d]isorder, and [p]ost [t]raumatic [s]tress [d]isorder." (Ex. F, Narrative Report, Oct. 7, 2012.)  Dr. Shah found the symptoms of her illness to be "so severe that they affect her ability to function socially and in her capacity as a student. . . Her illness has adversely affected her relationship with her family." (Ex. F, Narrative Report, Oct. 7, 2012.)

>   *c. Procedural History*

On June 7, 2011, Plaintiffs filed a complaint in the instant matter with this Court with the following claims against the Defendants ("Complaint"):

> I. Violation of 42 U.S.C. § 1983 (arrest)
> II. Violation of 42 U.S.C. § 1983 (conspiracy)
> III. Violation of 42 U.S.C. § 1983 (Monell Liability)
> IV. Violation of New Jersey Law Against Discrimination ("NJLAD")
> V. Common law false arrest
> VI. Intentional infliction of emotional distress
> VII. Slander per se and defamation
> VIII. False light
> IX. Negligence

(*See* Compl. ¶ 1.)

On January 31, 2013, Defendant Meade filed a motion for summary judgment ("Meade Motion") (Dkt. No. 36.)  On February 1, 2013, the Municipal Defendants filed their motion for summary judgment ("Municipal Defendants' Motion") (Dkt. No. 42.)  Also, on February 1, 2013, the Nayee Defendants filed a brief in support of the Meade Motion.  (Dkt. Nos. 37-41.)  On February 7, 2013, Nayee Defendants filed a cross motion for summary judgment.  (Dkt. No. 43.)

**STANDARD OF REVIEW**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter, but rather, must determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in "a light most favorable" to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-21 (1991). The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U. S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof,[]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

**DISCUSSION**

The federal claims and related legal issues in this matter do not involve genuine issues of material fact and are appropriate for summary judgment. The claims are discussed below.[9]

***42 U.S.C. 1983 - False Arrest (Count I) and Common Law False Arrest (Count V)***

To assert a Fourth Amendment claim, the plaintiff must show that a "'seizure' occurred and that it was unreasonable." *Flood v. Schaefer*, 367 F. App'x 315, 319 (3d Cir. 2010) (quoting *Curley v. Klem*, 499 F.3d 199, 203 n.4 (3d Cir. 2007) (alteration in original)). Accordingly, the Fourth Amendment "prohibits a police officer from arresting a citizen except upon probable cause." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)(citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1872)). Thus, "[t]he proper inquiry in a Section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). "[W]hen an officer has probable cause to believe a person committed even a minor crime[,] . . . the balancing of private and public interests is not in doubt [and t]he arrest is constitutionally reasonable." *Virginia v. Moore*, 553 U.S. 164, 171 (2008). Therefore, a plaintiff must set forth "the facts [showing that, under the] circumstances within [the officer's] knowledge, a reasonable officer could not have believed that an offense had been or was being committed by the person to be arrested." *Mosley v. Wilson*, 102 F.3d 85, 94–95 (3d Cir. 1996); *accord Revell v. Port Authority of New York, New Jersey*, 598 F.3d 128, 137 n. 16 (3d Cir. 2010).

In the instant matter, Plaintiffs' allegation "that an unconstitutional seizure occurred" in violation of the Fourth and Fifth Amendments by the Officer Meade is not supported. (*See* Pls.'

---

[9] As the Municipal Defendants note in their reply papers, Plaintiffs did not specifically address the arguments in opposition to Counts Two (Conspiracy), Count Three (Monell liability), Count Four (Law Against Discrimination), Count Eight (Negligence), and claims of intentional infliction of emotional distress. (*See* Municipal Defs.' Reply 1.)

Opp'n Br. 7.)  By Plaintiffs' own statements Plaintiffs, and specifically Binal Vaidya, were never actually arrested or seized.  (Ex. A 55:4-56:3.)  At most, Binal Vaidya testified that she felt as if she could not leave, but was at all times at her home or with a parent nearby.  (*See* Ex. A, Tr. 42:19-46:2-10; Ex. C, Tr. 16:6-18, 18:9-24, 28:24-29:7.)  In fact, her mother Sudha even consented to Binal Vaidya going outside to speak to Officer Meade.  (Ex. C at Tr. 17:8-11.)  There is no genuine issue of material fact regarding this scenario, and a claim against the Defendants for false arrest cannot be maintained.

The common law tort of false arrest is (1) "an arrest or detention of [a] person against his or her will" and (2) "lack of proper legal authority or 'legal justification.'"  *Mesgleski v. Oraboni*, 330 N.J. Super 10, 24 (App. Div. 2000) (quoting *Barletta v. Golden Nugget Hotel Casino*, 580 F. Supp. 614, 617 (D.N.J. 1984)).  The only two defenses available to a public employee include legal justification and probable cause.  *Hayes v. Cnty. of Mercer*, 217 N.J. Super 614, 623 (Ap. Div. 1987).  However, a plaintiff does not need to prove a lack of probable cause to prevail.  *Mesgleski*, 330 N.J. Super at 24.  Additionally, while a public employee is not required to demonstrate good faith if his or her conduct was reasonable, a public employee can demonstrate subjective good faith as "a second line of defense at trial, regardless of whether he or she was acting reasonably." *Mesgleski*, 330 N.J. Super. at 25 (citing *Brayshaw v. Gelber*, 232 N.J. Super. 99, 110 (App. Div. 1989); *Hayes*, 217 N.J. Super. at 622-23).

While there was a reason to speak to the Vaidya family regarding the request for citizen assist or investigation of the note, the more important element missing from Plaintiffs' claim of common law false arrest is the actual arrest or detention of Binal Vaidya against her will or of any of the Plaintiffs.  Further, Plaintiffs argue that an "investigative detention that goes on for an unreasonable amount of time or is carried out by unreasonably intrusive means may at some point

become a defacto arrest for which probable cause is required." (*See* Pls.' Opp'n Br. 8 (citing *United States v. Sharpe*, 470 U.S. 675, 685-87 (1985)). However, the court in *United States v. Sharpe* also notes that

> in assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

470 U.S. at 686. Further, "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." (*Id.*) Here, Plaintiffs have not shown unreasonable behavior or prolonged investigation. An officer spoke to Binal Vaidya in her home for five to seven minutes, and the officers may have stayed at the Nayee home for about an hour, but there is no basis in the record to support unreasonable detention. Officer Meade claims Hemlata Nayee requested he play "referee" in the matter, but that he denied the request because it was a "civil matter" and there is testimony that Officer Meade tried to get the families to be quiet and was "being helpful" to the Nayee family. (Ex. B, Tr. 29:15-18, 32:15-20; Ex. D, Tr. 50:21-T51:9.) No one indicates that they were prohibited from leaving or detained against their wishes. (Ex. C, Tr. 18:9-24.)

Accordingly, this Court will dismiss Plaintiffs' claims of false arrest under 42 U.S.C. § 1983 and common law false arrest.

*42 U.S.C. § 1983 Conspiracy (Count II)*

For an actionable section 1983 conspiracy claim to exist, "the plaintiff must make specific factual allegations of a combination, agreement, or understanding among all or between any of the defendants to plot, plan or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right." *Fioriglio v. City of Atlantic City*, 996 F. Supp. 379, 385

(D.N.J. 1998) (citing *Darr v. Wolfe*, 767 F.2d 79, 80 (3d Cir. 1985)); *Ammlung v. City of Chester*, 494 F. 2d 811, 814 (3d Cir. 1974)).

The existence or nonexistence of a conspiracy is a factual issue for the jury to decide. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970). However, to move past summary judgment, the plaintiff must show that a jury could "infer from the circumstances [(that the alleged conspirators)] had a 'meeting of the minds' and thus reached an understanding" to achieve the conspirators' objective. *Id.* at 158. Furthermore, the plaintiff is required to "prove with specificity the circumstances of the alleged conspiracy, such as those addressing the period of conspiracy, object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose." *Fioriglio*, 996 F. Supp. at 386.

Here, Plaintiffs did not file their Complaint within one year after the cause of action accrued. *See* 42 U.S.C. § 1986 ("But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.") Further, Plaintiffs have not addressed the specifics of the alleged conspiracy in order to meet the standard articulated above.[10] As discussed herein, Plaintiffs have not demonstrated a basis for false arrest or a "chain of events" from which a trier of fact could reasonably infer a conspiracy to "deprive plaintiff of a federally protected right."

Based on the foregoing, this Court will dismiss Count II, regarding Plaintiffs' claim of conspiracy.

### *42 U.S.C. § 1983 Monell Liability (Count III)*

Under *Monell v. Dept. of Soc. Services of the City of N. Y.*, in order to establish liability under section 1983, a plaintiff must demonstrate that "municipal policymakers, acting with

---

[10] Plaintiffs did not oppose the Municipal Defendants arguments regarding conspiracy (Count II), Monell Liability (Count III), NJLAD (Count IV), intentional infliction of emotional distress (Count VI) or negligence (Count XIII).

deliberate indifference or reckless indifference, established or maintained a policy or well-settled custom which caused a municipal employee to violate plaintiffs' constitutional rights and that such policy or custom was the 'moving force' behind the constitutional tort." *Hansell v. City of Atlantic City*, 152 F. Supp. 2d 589, 609 (D.N.J. 2001) (citing *Monell v. Dept. of Social Services of City of N.Y.*, 436 U.S. 658 (1978)).

A policy is created when "a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Hansell*, 152 F. Supp. 2d at 609 (internal quotation marks omitted). On the other hand, a custom is "[a] course of conduct . . . not authorized by law, [where] 'such practices of state officials [are] so permanent and well settled as to virtually constitute law.'" *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1986) (quoting *Monell*, 436 U.S. at 658).

A municipality can be held liable under 42 U.S.C. § 1983 "only where its policies [or customs] are the 'moving force [behind] the constitutional violation.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)(second alteration in original)(internal citation omitted). The first inquiry in a case alleging municipal liability under section 1983 is to look at whether a "direct causal link" exists between the "policy or custom and the alleged constitutional deprivation." *Id.* at 385. If a "direct casual link" exists, liability under section 1983 still requires a showing that the "municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *Id.* at 388. "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *Id.* at 385 (emphasis in original).

The torts of negligent hiring and retention, and the tort of negligent training and supervision, are considered in light of certain factors. *See generally Harris*, 489 U.S. at 387; *Di Cosala v. Kay*, 91 N.J. 159, 174 (1982). First, "the identified deficiency in [a city's] training program must be closely related to the ultimate injury." *See Harris,* 489 U.S. at 391. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city . . ." *Id.* at 390-91. Additionally, a pattern of tortious conduct by inadequately trained employees can demonstrate "that the lack of proper training, rather than a one-time negligent administration of the program . . . is the 'moving force' behind the plaintiff's injury." *Bd of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407-08 (1997).

Second, the adequacy of the training program in relation to the tasks the particular officers must perform helps determine whether a "deliberate indifference" existed. *See Harris,* 489 U.S. at 389-90. Police continuing to adhere to a policy or custom that they know or should know has failed to prevent tortious conduct by its officers is enough to establish evidence of "deliberate indifference." *Brown*, 520 U.S. at 407; *see also Di Cosala*, 91 N.J. at 173.

In the instant matter, Officer Meade did not have final policymaking authority and Plaintiffs have failed to offer evidence of a pattern of prior incidents of similar alleged constitutional violations. Plaintiffs also have not shown evidence of indifference or habitual neglect, which would support a *Monell* claim in these circumstances. Plaintiffs were not arrested and the undisputed facts of the incident do not reflect extreme actions or support "deliberate indifference" on the part of the police or the Municipal Defendants. As such, the claims filed pursuant to 42 U.S.C. § 1983 will be dismissed.

*NJLAD (Count IV)*

Pursuant to NJLAD, "discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, gender identity or expression, affectional or sexual orientation, marital status, [or] familial status . . . is prohibited." N.J.S.A. 10:5-3." The direct evidence, if true, must "demonstrate not only a hostility toward members of the [plaintiff's] class, but also a direct causal connection between that hostility and the challenged [conduct]." *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 208 (1999); *see McDevitt v. Bill Good Builders, Inc.,* 175 N.J. 519, 528 (2003) (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002)). A crucial element of NJLAD is the intent to discriminate. *See generally Rojas v. City of New Brunswick*, Civ. No. 04-3195, 2008 WL 2355535 at *31-32 (D.N.J. 2008) (citing *Parker v. Dornbierer*, 140 N.J.Super. 185, 189, 356 A.2d 1 (App.Div.1976)).

In the instant matter, Plaintiffs allege that "under color of state, Plaintiffs' liberty was threatened, and they were intimidated and coerced and their zone of privacy invaded." (Compl. ¶ 44.) Further, Plaintiffs assert that "Plaintiffs' race, ethnicity, and or immigration status was a motivating factor in their mistreatment and irregular handing by the law enforcement defendants." (Compl. ¶ 45.) However, Plaintiffs do not indicate that there was intent to discriminate. Plaintiffs' main complaints seem to be that Officer Meade was assisting the Nayees[11] (who are of the same ethnic background, Indian) and that Officer Meade treated everyone "like [they] were idiots" or dumb. (Ex. B, Tr. 6:20-7:24, 36:12-15; Ex. A, Tr. 56:1-10, 9-57:18.) Binal and Rashmin Vaidya both admitted that at no time did anyone make any comments regarding their ethnicity. (Ex. A, Tr. 56:1-3; Ex. B, Tr. 36:8-12.) Thus, Plaintiffs do not adequately meet the legal standards for a claim under NJLAD, and as a result, Plaintiffs' NJLAD claim will be dismissed.

---

[11] However, Binal Vaidya testified that the officers spoke to both families the same way. (Ex. B, Tr. 36:12-15; Ex. A, Tr. 56:9-20.)

*Intentional Infliction of Emotional Distress (Count VI), Slander Per Se and Defamation (Count VII), False Light (Count VIII), and Negligence (Count IX)*

As this Court dismisses all of Plaintiffs' federal claims, it declines to reach the remaining state law claims listed above. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Stehney v. Perry*, 907 F. Supp. 806, 825 (1995 D.N.J.) ("[A] federal district court may decline to exercise its supplemental jurisdiction over state law claims if all federal claims are dismissed."). As such, this Court declines to exercise supplemental jurisdiction over the state law claims and they will be dismissed without prejudice.

**CONCLUSION**

For the foregoing reasons, this Court **GRANTS IN PART AND DENIES IN PART** the Motions of Defendants. The state law claims are dismissed without prejudice.

                                                                s/ Susan D. Wigenton, U.S.D.J.

Orig:       Clerk
cc:         Parties
              Magistrate Judge Arleo